UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE ROMERO,<br><br>                 Plaintiff,<br><br>      v.<br><br>COUNTY OF SANTA CLARA, et al.,<br><br>                 Defendants. | Case No.  11-cv-04812-WHO<br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ADMINISTRATIVE MOTIONS TO SEAL**<br><br>Re: Dkt. No. 85, 107, 110 |

On August 31, 2010, plaintiff Luke Romero, M.D., reported to the hospital where he worked that he was concerned about the quality of care provided by Dr. King, the Director of Pediatric Anesthesia, and complained that Dr. King discriminated against and harassed him. Within a year of that complaint, five peer review investigations of Romero's work were initiated, each with the potential to change the terms of his employment.   The last two of these investigations started within weeks of his second complaint to the County of Santa Clara's Employee Services Agency, Equal Opportunity Division ("EOD").  While there may be legitimate reasons for these reviews, Romero has presented evidence supporting an inference that they were initiated in retaliation for his protected activity, that he was unfairly "targeted" for peer review referral, and that his peer review investigations were conducted improperly.  He has raised material questions of fact that preclude summary judgment on his retaliation claims.  However, on various tort, wrongful termination, disability discrimination and hostile work environment claims, he has not met his prima facie burden.  Accordingly, I GRANT in part and DENY in part the defendants' motion for summary judgment.

## BACKGROUND

Dr. Romero is a former anesthesiologist and Director of Billing, Coding, and Compliance at Santa Clara Valley Medical Center ("SCVMC").  He claims that he was discriminated and

United States District Court<br>Northern District of California

United States District Court
Northern District of California

retaliated against by defendants the County of Santa Clara (the "County"), Friedrich Moritz (former Chair of the Anesthesiology Department at SCVMC), Dolly Goel (former Medical Director at SCVMC), Adella Garland (former Medical Staff President), and Bridget Philip (current Chair of the Anesthesiology Department) after he complained about harassment, discrimination, and retaliation.  Romero contends that after making the complaints, he was subjected to several "sham" peer reviews in 2011 in which his colleagues unfairly criticized his treatment of patients to build a case for his termination.  Romero was terminated on December 3, 2012, when he did not return to work after taking a leave of absence.

Romero began working at SCVMC during his anesthesia residency in July 1999.  He was hired as a staff anesthesiologist at SCVMC in 2002.  During Romero's residency and employment at SCVMC he had several negative encounters with Dr. Stephen King, the Director of Pediatric Anesthesia.  Romero openly identified as gay since he started his residency.  Declaration of Melissa Kiniyalocts ("MK Dec."), Ex. A, Romero Deposition at 160:5-14.  In 2003, King allegedly told Romero that he needed to look for employment in San Francisco to "be with his own kind."  *Id*. at 158:15-160:14; 167:13-168:4; 169:6-15.  Romero interpreted the comment as homophobic.  *Id*. at 160:5-14.

Romero testified that King did not make any other homophobic comments to him.  *Id*. at 160:15-22.  Coworkers thought that King was "abusive," "vindictive," and "nasty," to Romero, but they could not identify any specific comments regarding his sexual orientation.  Declaration of A. Cabral Bonner ("ACB Decl.") Ex. 6 at 87:10-16; Ex. 10 at 29:8-31:16; Crawley Decl. ¶ 5

In June 2010, Romero placed an epidural in an obstetric patient.  When Romero completed his shift, King took over and administered general anesthesia to the patient.  The patient subsequently underwent an urgent C-section.  Romero Dep. 292:20-294:6.  Romero contends that King exposed the patient to a dangerous anesthetic procedure and "was trying to orchestrate a negative patient complication" to reflect negatively on Romero's care of the patient and potentially subject Romero to a peer review.  *Id*. at 295:6-298:2.

On August 31, 2010, Romero sent an email to Moritz and SCVMC administration reporting his concerns regarding King's care of the obstetric patient and alleging discrimination,

harassment, and patient endangerment by King. *Id*. at 481:7-17; Ex. 14. Romero defended his decision to place an epidural in the patient and critiqued the quality of King's clinical care. *Id*. He alleged that King "deliberately withheld information from both the CRNA and the surgical team to best inform their decisions" and "decided to deviate from the standard practice of care which would be to remove the epidural catheter, perform a spinal anesthetic, and avoid recognized danger and risks to both mother and baby of general anesthesia and failed intubation." *Id*. Romero also stated that he feared retaliation by King because King had allegedly harassed him many times and threatened him three times that year. The complaint states, "this is the SECOND time this year where it has involved patient endangerment." The complaint describes an incident when Romero was Anesthesia Floor Manager and insisted that King perform a procedure. King threatened him by saying, "I promise you will regret ever doing this!!" *Id*. The complaint concludes that King's "sense of impugnity and infallibility has now escalated beyond the simple scope of bullying, harassment, and homophobia to a very visible and transparent level of patient endangerment." *Id*.

Based on Romero's allegations, the obstetric patient's case was peer reviewed. On September 24, 2010, a group of anesthesiologists, which included Moritz and Philip, determined that no adverse event occurred and that the clinical decision-making exhibited by King was within the standard of care. MK Dec. Ex. F at 62:13-18; 66:5-10; Ex. 144.

SCVMC then forwarded Romero's August 31, 2010 complaint to the EOD to investigate the allegations of discrimination, harassment, and retaliation. EOD officer Vernon Crawley investigated the complaint from October 2010 through December 2010 and interviewed sixteen witnesses. Crawley Decl. ¶¶ 3-4. Crawley's February 11, 2011 report concluded that Romero's allegations of discrimination were unsubstantiated. *Id*. ¶¶ 5-8. The investigation did find "a preponderance of opinion that King demonstrated interpersonal behavior that was intimidating, vindictive and contributing to a disharmonious work environment." Declaration of Charles A. Bonner ("CAB Decl.") Ex. 4. King admitted to saying "I'm going to get you for this" when Romero was Anesthesia Floor Manager. *Id*. SCVMC management took action against King for making threatening comments to coworkers and required that he complete anger management

United States District Court
Northern District of California

1    training.  *Id*.  King retired from SCVMC in December 2010, in part because of frustration with the

2    EOD investigation.  ACB Decl., Ex. 5 at 75:17-76:4.

3           In October 2010, SCVMC revised its existing peer-review policies and adopted peer

4    review procedures to comply with federal and state laws and standards issued by The Joint

5    Commission, a non-profit organization that accredits and certifies health care organizations.

6    Amended Phong Decl., ¶ 3, Exs. D, E.  Peer review is the evaluation of a practitioner's clinical

7    performance by his or her peers where the practitioner is evaluated according to generally

8    recognized standards of care.  *Id*.  A case may be submitted to peer review through staff member

9    self-reporting, or when patient events occur that must be reviewed under guidelines issued by the

10   Joint Commission.  Patient events that trigger mandatory peer review under the guidelines include

11   unexpected heart attack, unplanned admission to the ICU, and death.  ACB Decl., Ex. 2 at Ex. 187

12   (Peer review committee policy and procedures).  A case is reviewed by a committee of SCVMC

13   practitioners.  The practitioner whose case is under review is not allowed to participate on the peer

14   review committee.  A written report from the treating practitioner is typically sought prior to the

15   committee's meeting and considered as part of the review.  The committee evaluates the case on a

16   rating scale from Q0 to Q6, with Q6 being the most negative rating.  *Id*.  A practitioner receiving

17   two peer review case ratings of Q3 or higher in a six-month period could be subject to disciplinary

18   action.  Negative peer review ratings could also be used to deny physician privilege renewal and

19   recredentialing.  *Id*.  SCVMC physicians must be recredentialed every two years.

20          Information shared in peer review proceedings is confidential.  The SCVMC's

21   confidentiality policy prohibits any individual serving on a peer review committee from sharing

22   peer review information "with anybody, including but not limited to, any County employee or

23   member of the [SCVMC] medical staff."  Romero Dep. at Ex. 5.  The policy warns that

24   "disclosing information about [a] peer review may result in disciplinary action, up to and

25   including termination, and/or revocation of medical staff privileges."  *Id*.

26          On October 21, 2010, Romero provided treatment to an elderly female burn patient, K.H.,

27   who was subsequently admitted to the ICU.  The case was referred to peer review "because it met

28   review criteria secondary to unanticipated ICU admit, reintubation, and Patient Safety Network

4

1    incident report." Phong Decl. ¶ 4; Ex. K.  On November 4, 2010, Dr. Cherine Abu-Eid, the

2    Quality Assurance Coordinator, notified Romero by email that K.H. would be reviewed and

3    requested his written summary of the case.  ACB Decl. Ex. 6 at Ex. 280.  Romero responded that

4    he could not find the patient's chart, which he needed to prepare his response.  *Id.*

5         On December 20, 2010, Romero received a favorable professional evaluation showing that

6    he met expectations in patient care, clinical knowledge, and other categories.  The evaluation form

7    was filled out by Moritz, who commended Romero on his revenues, billing, coding, and

8    compliance.  Romero Dep. 546:21-547:7, Ex. 26.  The evaluation states that none of Romero's

9    cases had been submitted for peer review in the previous two years.  *Id.*

10        In January 2011, Romero asked Moritz whether he would support his application for a one-

11   year pediatric fellowship at Stanford.  Moritz supported the request.  He stated that SCVMC might

12   be able to allow Romero to take leave for the fellowship in July, 2012.  Moritz wrote a letter of

13   recommendation for Romero in support of his application.  ACB Decl. Ex. 1 at Ex. 58.

14        In February 2011, two of Romero's patient cases were referred for peer review.  On

15   February 8, 2011, Romero treated patient P.O.  The matter was reviewed on March 22, 2011.  On

16   February 20, 2011, Romero treated patient A.  The matter was reviewed on June 28, 2011.  Abu-

17   Eid asked Romero to provide written summaries of each case, and Romero responded to each

18   request.  The cases received Q1 ratings by the peer review committees.  ACB Decl. Ex. 6 at 107:2-

19   113:9, Exs. 270-273.

20        In May 2011, SCVMC Medical Director Dr. Goel inquired with Abu-Eid why the case of

21   patient K.H. had not yet been peer reviewed.  Abu-Eid stated that she was waiting for Romero's

22   written summary.  ACB Decl. Ex. 6 at 168:2-169:3.  The case was peer reviewed on May 5, 2011

23   without Romero's written comments.  Phong Decl. Ex. K.  Abu-Eid does not recall whether she

24   asked Romero for his summary of events again before the case was presented to the peer review

25   committee.  *Id.*  She and Moritz testified that Romero had been asked for his summary "two or

26   three times."  ACB Decl. Ex. 1 at 305:20-22.  Romero denies being asked for his summary any

27   time after October 2010.  Romero Dep. at 260:15-261:12.  The review committee concluded that

28   Romero's care fell below acceptable standards and the case received a "Q4" rating.  *Id.*

United States District Court
Northern District of California

1    On the morning of May 9, 2011, Moritz and Dr. Ginieczki presented patient K.H.'s case as

2  an educational case study during a staff meeting.  Romero was unable to attend the meeting.

3  Romero alleges that Moritz knew in advance that Romero would not be able to attend the meeting

4  because of his schedule. [1]  ACB Decl. Ex. 3, Garland Dep. at Ex 120 (Romero's complaint to

5  hospital administrators alleging that Moritz "had full knowledge of my absence.").  Moritz

6  testified that because Romero was out on vacation, he was "probably not" notified that the case

7  would be discussed at the Monday morning meeting.  ACB Decl. Ex. 1, Moritz Dep., 303:17-24,

8  305:7-25.  Participants at the meeting thought that Moritz's presentation made "destructive"

9  comments about the practitioner who handled the case.  Garland Dep. at 66:1-25.  Although

10  Romero's name was not disclosed as the treating physician, "everybody knew whose case it was"

11  and the meeting "fell apart" when a staff member, Richard Hughes, protested that the meeting was

12  unfair because the practitioner was not in attendance.  ACB Decl. Ex. 3, Garland Dep. at 66:14-25;

13  Ex. 1, Moritz Dep. at 308:20-309:10.  The next day when Romero returned to work, coworkers

14  told him the presentation was biased and described it as "character assassination" and

15  "slanderous."  Romero Decl. at 184:10-189:9.

16    That afternoon, Moritz sent an email to SCVMC Medical Director Dolly Goel and Medical

17  Staff President Adella Garland, stating,

18        I need to address this quality of care issue with you.  I am concerned about
      the care provided by Dr. Luke Romero.  We have two cases, one of which
19      was considered completely below standard of care in the care of an 89 year old female
      with a burn by review of the Anesthesia QA committee and an Anesthesia QA
20      department discussion.  The other was a 3 year old with a significant intraoperative
      desaturation (QA under review and pending) that threatened a healthy 3yo [sic]
21      girl.
22        The first case was so mishandled as to question his ability to provide good
      medical judgment in the care of our patients.  What would be your
23      recommendations for next steps in this medical staff process?
24        There may be some concerns about "retaliation" as this provider has filed an
      EOC discrimination complaint in the past that on investigation by the EOC, was

25  _____

26  [1] In an email to SCVMC administrators Romero states that he could not attend the meeting
   because he was attending a medical conference in New York.  *See* ACB Decl. Ex. 3 at Ex 120.
27  Moritz testified that he believed Romero could not attend the meeting because he was on a pre-
   approved vacation.  ACB Decl. Ex. 1, Moritz Dep. at 300:11-301:3.   In his deposition, Romero
   testified that he did not attend the meeting because he was scheduled to work the night shift.
28  Romero Dep. at 187:14-21.

found to be unsubstantiated.

ACB Decl. Ex 1 at Ex. 85.

Goel responded, "Fritz are you saying that given the circumstances of the first case you consider him continuing to provide service represents an immediate threat to patient safety or that you need to put him on an immediate and very stringent FPPE[2] with close monitoring?" *Id*. Ex 86. Moritz replied, "We should meet and discuss." *Id*. On May 23, 2011, Goel responded:

> Hi, Fritz, as per our conversation just now, the peer review investigation is not complete. The committee will be receiving a response from Dr. Romero on these cases, and use his response to deliberate on their findings. So for now, we will take no action. You will let us know if the peer review committee had findings concerning enough to raise to an FPPE or patient safety level. Thanks.

*Id*.

On May 31, 2011, Romero filed a charge with the California Department of Fair Employment and Housing, Equal Employment Opportunity Commission ("EEOC") alleging discrimination, harassment, and retaliation. He also complained about the May 9, 2011 meeting, and stated that it "included negative biases toward me, violation of due process, misrepresentation of information, breach of confidentiality and privacy, inflammatory remarks, and threats of termination . . . ." CAB Decl. Ex. 6.

The case of patient K.H. was referred to an outside anesthesiologist for further review. In June 2011, the outside anesthesiologist opined that the standard of care given to patient K.H. fell below acceptable standards.

On June 20, 2011 Romero received a favorable professional evaluation showing that he met expectations and was commended by Moritz for his revenues, billing, coding, and compliance. Romero Dep. at 546:21-547:7, Ex. 26. Moritz wrote, "Thank you for your support and lead on the Anesthesia Billing and Coding! Great job! Your regional skills are tremendous! Thank you! Please remember to sign in on departmental meetings." *Id*. Moritz also wrote that Romero received a "Q5" result in a peer review. The highest peer review result Romero had received was a "Q4" for the care of patient K.H. Romero Dep. at 548:20-549:3; Ex 27. Moritz did not note any other concerns with Romero's performance.

---

[2] "FPPE" refers to Focused Professional Practice Evaluation.

United States District Court
Northern District of California

On August 2, 2011, two of Dr. Jana Dolnikova's cases were submitted to peer review.  On August 17, 2011, Romero, Dolnikova, and three other doctors sent a signed letter to management complaining that doctors Bridget Philip and Kelley Yeh violated peer review policies during Dolnikova's reviews.  SCVMC Medical Staff President learned that the complaints were true, but she did not report the privacy breach to the SCVMC compliance officer, Anna Hughes.  ACB Decl. Ex 3 at 74:6-75:10, Ex. 116.  Romero contends that Moritz, Yeh, and Philip manipulated the new peer review process to their advantage to unfairly target individuals who had participated in the EOD investigation.  *See* Romero Dep. at 182:9-15 ("the peer review system only focused on the witnesses, and those people that were incriminated in the EOD investigation, their cases were not coming up. They were not being reported for anything").  He alleges that King was "extremely close" to defendants Moritz, Philip, and Yeh, both professionally and personally. [3]  Romero Dep. at 261:19-24.  Dr. Carla Schnier stated in her deposition that she believed some doctors were unfairly "targeted" in peer reviews.  Schnier believed that she, Romero, and Dr. Dolnikova were among those targeted.  ACB Ex. 10 at 21:17-24:24.

On August 24, 2011, Romero filed a second complaint with the EEOC alleging age discrimination because he was allegedly denied the opportunity to be part of a peer-review committee, and the majority of the committee was composed of doctors under age 40.  Romero Dep. at 520:17-24, Ex. 21.

On August 26, 2011, Romero sent a lengthy email titled "Sham peer review - Whistleblower Retaliation" to SCVMC Medical Staff President Adella Garland and other SCVMC administrators detailing concerns regarding his peer review investigations and alleged harassment and retaliation by Mortiz and Yeh.  ACB Decl. Ex. 3 at Ex 120.  The email describes in detail Romero's views why the negative outcome of the peer review of patient K.H. was not warranted. The email also alleges that the May 9 staff meeting was improper because he was not present to defend himself, the presentation made "slanderous and erroneous statements about the quality of care," the presentation was not a "balanced portrayal" because the plastic surgeon caring for K.H.

---

[3] Romero's EOD complaint accused King and Yeh of having an affair.  Crawley Decl. ¶¶ 6-7. Both King and Yeh denied having an affair and the complaint was unsubstantiated.  Id.

was not contacted for a narrative, "the presentation lacked any citations to literature and scientific studies," and other concerns.  *Id*.  Romero asserted that the peer review and May 9 presentation were retaliation by Moritz and Yeh for the EOD investigation.  *Id*.  The email also alleges that Moritz and Yeh kept patient charts and other files from Romero.  *Id*.

On August 29, 2011, Romero filed a second complaint with the EOD for discrimination based on age, marital status, race, sex, sexual orientation, and retaliation against Moritz, Philip, Yeh, and Ginieczki.  The complaint alleged that the anesthesiology department used the peer review process to build evidence for his termination.  Romero also alleged that Moritz led the peer review process against Romero in retaliation for his prior complaint to the EOD.  CAB Decl. Ex. 7.  The investigating EOD officer, Mark Paschal, concluded that the complaint could not be sustained.  Paschal Decl. ¶¶ 3-6.

On September 26, 2011, Quality Assurance Director Cherine Abu-Eid emailed Romero to inform him that two of his cases, B.D. and R.S., would be submitted to peer-review on November 14, 2011.  Patient B.D. died in October 2010, a year earlier.  Abu-Eid testified that submitting a case to peer review one year after a patient's death "would be late."  ACB Decl. Ex. 6 at 179:18-180:1.  Romero also testified that according to his understanding of hospital policies, the case "should have been reviewed within a month or two."  Romero Dep. at 252:3-16.

Romero filed this case on September 28, 2011.  Dkt. No. 1.

On October 9, 2011, Romero asked an orderly, Jovon Sadler, to retrieve four medical charts.  One of the charts belonged to a patient treated by Moritz who had died at SCVMC on December 25, 2010.  Romero Dep. at 87:19-89:18.  Romero did not work on December 25, 2010, and he did not provide care for the patient.  *Id*. at 92:8-19.  Romero testified that he requested the chart as part of an investigation into billing compliance and Medicare fraud.  *Id*. 93:10-94:17.  He had heard that medical residents were providing care without the supervision of an attending physician, but that patients were nevertheless charged for physicians' services.  *Id*.  Romero had heard that the December 25, 2010 death was caused in part because a resident had been unsupervised and "abandoned for seven hours."  *Id*.  Sadler gave Romero the chart.  Romero made photocopies of it.  *Id*. at 100:12-20.

On October 14, 2011, Jovon Sadler reported Romero's request to Bridget Philip, who at the time was the Vice-Chair of the Anesthesiology Department.  MK Decl., Ex. N at 36:7-38:3.  SCVMC's Compliance and Privacy Officer, Anna Hughes, investigated the incident.  On November 1, Hughes attempted to schedule a meeting with Romero.  Romero Dep. at 116:6-18:15.  The meeting was scheduled for November 2, and then rescheduled for the following week.  Romero showed up for the meeting, but Anna Hughes was unavailable.  Romero Dep. at 123:13-126:24.  The meeting was rescheduled again to November 18, 2011.  *Id*. at 120:21121:6; Ex 4.

On November 17, 2011 Romero participated in a peer review of Dr. Carla Shnier.  Romero Dep. at 128:17-131:8.  Afterwards, Shnier reported to Philip that Romero had disclosed confidential information to her from the peer review.  Philip reported the allegations to the compliance officer Anna Hughes.  Philip asked Romero whether the allegations were true, and he denied them.  Romero Dep. at 144:25-145:10; MK Dec. Ex. H at 222:21-223:15.

Romero states that the allegations by Shnier and Philip were "the final trigger that took me over the top."  Romero Dep. at 128:7-12.  Romero went on medical leave the next day, on November 18, 2011, supported by a note from his doctor requesting a two-month leave for medical disability.

On November 25, 2011, Medical Director Dolly Goel sent Romero a letter that requested additional information about his medical leave and enclosed a copy of the County of Santa Clara Policy and Procedures for Reasonable Accommodation.  Romero Dep. at 565:3-18; Exs. 32, 38.  The letter states, "If your health care provider determines that you have certain work limitations but you can perform your essential job functions with some form of accommodation, please let us know what that accommodation is so we can assess that proposed accommodation under the County's policies."  *Id*.  The letter also states, "you have now postponed or cancelled several scheduled meetings with Anna Hughes regarding her important HIPAA investigation.  Please confer with your health care provider and determine whether and when your health care provider believes you will be able to meet with Ms. Hughes regarding her investigation."  *Id*.

The County of Santa Clara Policy and Procedures for Reasonable Accommodation states that a request for reasonable accommodation may be made by an employee, or a family member or

health professional acting on behalf of an employee.  It states, in relevant part:

> Employees who are seeking reasonable accommodation must submit a copy of the Reasonable Accommodation Request Form (Form A) with required information concerning his or her work capacities and restrictions to his or her immediate supervisor.  The manager/supervisor shall forward a copy of the Request, Form A, to the Coordinator of Programs for the Disabled.  Employees who do not provide information from their medical provider concerning work restrictions, will not be eligible to move forward in the process for reasonable accommodation consideration.

*Id*.  The policy also states that within 20 days of the completion of the process described above, the employer must make a determination as to whether an accommodation can be provided.  *Id*.  If an accommodation can be provided, the employer must fill out the attached Form B.  *Id*.

Romero responded on December 2, 2011 that his "health care provider did not request reasonable accommodations, or indicate that I would not be able to perform my essential job functions . . . upon my release from medical leave for work stress, I will be more than happy to meet with Ms. Hughes along with my attorney."  *Id*. Ex 33.

Goel replied via letter dated January 10, 2012:

> This confirms our understanding that your return-to work date is Thursday, January 19, 2012, based on your health care provider's letter . . . At 11:30 that morning, you will be required to meet with our Santa Clara Valley Health & Hospital System Compliance Officer regarding a HIPAA investigation that could result in discipline . . . If you or your health care provider believes you have a disability that requires any accommodation(s) relating to your return to work, please let me know so the County can engage in the interactive process with you relating to possible accommodation(s).

*Id*. Ex. 38.  The letter enclosed the County's reasonable accommodations policy again.

Romero submitted another letter from his doctor extending his leave to March 17, 2012. On January 20, 2012, Goel wrote to Romero acknowledging receipt of the request for an extension and notified Romero of "several pending issues that we need to address with you."  The letter stated that: (i) Romero's medical staff member privileges were suspended pursuant to SCVMC's bylaws; (ii) Anna Hughes was still waiting to interview him regarding the alleged HIPAA violation and would proceed with her investigation without his input if he did not respond by February 10, 2013; (iii) Department Chair Bridget Philip needed to meet with him to discuss the alleged breach of peer review confidentiality; and (iv) someone had logged into Romero's account

11

United States District Court
Northern District of California

1   at SCVMC while he was on leave, and for security reasons his account was locked until he

2   returned.  *Id.* Ex 39.

3     On January 26, 2012 Romero's doctor wrote a letter stating, "[a]t this time, the above

4   named patient is still on disability and is not released from clinical care.  I have not requested a

5   reasonable accommodation for him based on the Santa Clara County Hospital Policies and

6   Procedures and the Americans with Disabilities Act."  MK Decl. Ex. S at Ex H.  The letter also

7   stated that Romero's condition had worsened since receiving letters from SCVMC demanding that

8   he respond to requests for further meetings.  *Id.*  It also states, "[i]n my clinical opinion, any

9   exposure to the hostile work environment at the hospital would exacerbate his condition and

10  complicate his recovery and care."  *See also Id.* Ex. J (March 2, 2012 letter from Romero's

11  therapist stating that SCVMC's communications were "intimidating and deeply disturbing to my

12  patient" and "exacerbating his already severe panic attacks" and stress disorders).  Romero

13  testified that his relapses were precipitated by "the letters ordering me to leave my medical

14  disability to go to the interviews with Dr. Thomas Bush and Dr. Bridget Philip."  Romero Dep. at

15  446:22-447:12.

16    The same day, Romero filed a third charge with the EEOC alleging discrimination based

17  on race, sex, national origin, age, disability, and retaliation.  Romero Dep. at 523:14-524:9, Ex. 22.

18  Romero alleged that the County continued to discriminate and retaliate against him by tampering

19  with his reappointment application and suspending his staff privileges.

20    On January 27, 2012, Romero responded to Goel, "[a]t this date, neither my treating

21  physician nor I have requested reasonable accommodation pertaining to my return."  *Id.* Ex. 40.

22  Romero also contested the suspension of his medical privileges and complained that the

23  suspension was an adverse employment action.  *Id.*

24    On January 27, 2012, and February 14, 2012, SCVMC notified Romero that "because your

25  provider indicated that you are 'unable to function at work' and that you have 'clinically

26  significant distress and impairment in both social and occupational functioning'" the Medical

27  Executive Committee ("MEC") voted to suspend consideration of his reappointment application

28  pending an evaluation of his health status pursuant to hospital bylaws that require reappointment

United States District Court
Northern District of California

1    to be based in part on a "reappraisal of the member's health status."  *Id*. at 587:14-20; Exs. 41, 42.

2    The letter states that pursuant to hospital bylaws, Romero's privileges would be automatically

3    suspended when they came up for renewal until he was ready to resume his clinical duties and

4    continue the reappointment process.  *Id.*

5        On May 25, 2012, Garland notified Romero that the MEC had voted to conduct a formal

6    investigation into the HIPAA and peer-review confidentiality breaches.  *Id*. at 595:15-23, Ex. 43.

7    The decision was based in part on a report submitted by compliance officer Anna Hughes to the

8    MEC on April 17, 2012 concluding that Romero violated state and federal privacy laws because

9    he had accessed a patient's record without a work-related reason to do so.  Hughes Decl. ¶ 5-6;

10   Romero Dep. Ex. 43.  The MEC appointed Dr. Thomas Bush to conduct the investigation.

11       Romero's health care providers requested extensions of his medical leave to November 30,

12   2012.  Romero Dep. at 598:22-599:4; 601:7-18, Exs. 44 and 46.

13       On September 18, 2012, Philip wrote to Romero stating that SCVMC "will be unable to

14   grant any further extensions of your leave beyond November 30, 2012."  The letter states:

15       Your extended absence has created a hardship on the Department of Anesthesia.
         Your medical leave from the County began on November 17, 2011, and has been
16       extended several times. In addition, you have exhausted all of your FMLA leave
         under state and federal law, as well as County policy. The County requires that you
17       report to my office on Monday, December 3, 2012, at 8:00 a.m., and your failure to
         do so will leave the County with no choice but to separate you from employment.
18

19   *Id*. at 603:11-24; Ex. 47.   The letter also stated that Romero was required to meet with Dr. Tom

20   Bush on December 3, 2012 regarding the MEC's privacy violation investigation.  It included

21   another copy of the County's Reasonable Accommodation packet and asked Romero to confer

22   with his doctor and inform SCVMC of any requested accommodations.  *Id.*

23       On September 20, 2012, Romero's doctors recommended that he "transition back into the

24   workforce" and advised him to work as an anesthesiologist at Stanford Hospital, where he had

25   medical privileges.  ACB Decl., Ex. 14 at 108:8-109:19; Ex. N.  However, his doctors advised him

26   not to return to SCVMC because "he has experienced unrelenting retaliation from that hospital

27   administration . . . which has [] been the cause of his psychiatric relapses."  *Id*.  *See also* ACB

28   Decl. Ex. 13 at 60:15-61:10 ("it would have been counter-therapeutic for me to even suggest that

13

he go back to work at [SCVMC].").  Romero began working at Stanford Medical Center.  *Id*. at 58:10-59:1.

On September 24, 2012, Romero filed a fourth charge with the EEOC alleging discrimination based on race, sex, religion, national origin, age, disability, and retaliation. Romero Dep. at Ex. 23.  Romero reasserted his prior claims about suspension of his staff privileges and alleged that he was falsely accused of HIPAA and peer-review confidentiality breaches.

On October 29, 2012, Romero wrote to Garland,

> Concerning my appointment on December 3, 2012, can you please provide answers to my questions:
>
> 1.  Can I bring an audio or video recorder?
>
> 2.  In order to comply with my legal rights of due process, please outline the agenda of the issues to be discussed?
>
> 3.  Can you please outline the appeal process to Anna Hughes HIPAA investigation?  As you know, she denied my legal due process, passed a negative judgment with serious consequences to my job and career, and concluded the HIPAA investigation without procuring my testimony.
>
> 4.  Can you please provide a list of the neutral unbiased physicians outside the SCVMC in San Francisco that I can contact?  I am apprehensive that a physician list selected by SCVMC executives can have the potential for ongoing retaliation against me.  I will be able to provide a comprehensive physical and mental exam by my health care providers to attest that I am capable of fulfilling my clinical duties without reasonable accommodations.

ACB Dec., Ex 3 at Ex. 135.

On November 16, 2012, department chair Philip wrote to Romero again stating that his absence had created a hardship that had "resulted in delays and inefficiencies in the delivery of patient care, and places a burden on staff and patients."  ACB Decl., Ex. 2 at Ex. 215.  The letter reiterates, "you are required to report to me on December 3, 2013 at 8:00am, at which time you will be interviewed by Dr. Bush in connection with his investigation on behalf of the MEC."  *Id*.

On November 20, 2012, Romero had a relapse of his psychiatric symptoms when his shifts at Stanford Medical Center were cancelled.  ACB Decl., Ex 13 at 58:4-59:1.  On November 21, 2012, Romero's therapist wrote to SCVMC,

> In my professional opinion, Dr. Romero should not attend the meeting at Santa

14

> Clara Valley Hospital scheduled for Monday, December 3, 2012.  It should be
> rescheduled for late January 2013.  Due to a history of ongoing retaliation by the
> hospital administration, combined with recent life stressors from family health
> issues, this meeting might result in further psychiatric relapse.  I understand that
> Dr. Romero is experiencing some life stresses related to family medical issues,
> which will require his attention during the winter holidays.  This meeting should be
> rescheduled later in January 2013.

MK Decl. Ex. S at Ex. P.

On November 30, 2012, Philip, who had been promoted to Anesthesiology Department Chair, emailed Romero to notify him that the request to reschedule the meeting was denied, the County was unable to grant any further leave extensions, and he was expected to report to work on December 3, 2012 at 11:30am to meet with Bush.  Romero Dep. Ex 49.

Romero did not return to work on December 3, 2012.  Philip sent Romero a letter that day stating that he was separated from employment because he failed to return.  Romero Dep. Ex. 50.

Romero filed a fifth charge with the EEOC alleging discrimination based on race, age, disability, and retaliation.  Romero Dep. at 529:23-530:4, Ex. 24.  Romero alleged that the County failed to accommodate his request to remain on medical leave and wrongfully terminated his employment.  *Id.*

Santa Clara County Policy allows "leave without pay" for "up to one year" and provides that "leaves beyond one year may be granted due to unusual or special circumstances."  ACB Decl. Ex 2 at 80:11-23, Ex. 183.  "Illness beyond that covered by sick leave" is an approved reason for leave beyond one year.  *Id.*  Department Chair Philip was aware that the leave policy allowed for extensions beyond one year.  She did not discuss with HR whether Romero qualified for the extension. Id. at 247:15-248:25.  Based on discussions with County counsel and the hospital administration, her understanding was that "there was no other option."  ACB Decl., Ex. 2 at 261:18-263:3.

Romero estimates that he made about 100 reports of alleged substandard medical care at SCVMC in the spring of 2012 while on leave.  Romero Dep. at 368:24-369:13.  The Joint Commission conducted a survey at SCVMC in April 2012 to investigate allegations regarding patient safety and peer review, and found no deficiencies.  Goel Decl. ¶ 4.  In October 2012, the Accreditation Council for Graduate Medical Education investigated complaints that

15

1    anesthesiology residents were not properly supervised.  It found that SCVMC's responses to the

2    allegations were adequate and closed the investigation.  Goel Decl. ¶ 3, Ex. T.

3    **PROCEDURAL BACKGROUND**

4         Romero filed this case on September 28, 2011. [4]  Romero filed the operative Third

5    Amended Complaint on October 10, 2013.  Dkt. No. 64.  It alleges the following causes of action:

6    (1) retaliation under the Fair Employment and Housing Act, California Government Code section

7    12940 ("FEHA") against the County; (2) retaliation in violation of California Health and Safety

8    Code section 1278.5 against the County; (3) retaliation in violation of his First Amendment rights

9    under 42 U.S.C. § 1983 against all defendants; (4) invasion of privacy against the County and

10   Moritz; (5) slander per se against the County and Moritz; (6) retaliation in violation of California

11   Labor Code section 1102.5 against the County; (7) intentional infliction of emotional distress

12   against the County and Moritz; (8) discrimination under Title VII and FEHA on the basis of

13   sexual orientation, age, and gender against the County; (9) hostile work environment in violation

14   of Title VII and FEHA against the County and Moritz; (10) wrongful termination in violation of

15   Title VII, FEHA, California Health and Safety Code section 1278.5, California Labor Code

16   section 1102.5, and the Americans with Disabilities Act, 42 U.S.C. section 12101 et seq. (the

17   "ADA") against the County; (11) failure to provide reasonable accommodation in violation of

18   FEHA and the ADA against the County; (12) failure to engage in the interactive process in

19   violation of FEHA and the ADA against the County; and (13) disability discrimination under

20   FEHA and the ADA against the County.

21        The defendants moved for summary judgment on all of Romero's claims on May 14, 2014.

22   Dkt. No. 85.  I heard argument on July 2, 2014.

23   **LEGAL STANDARD**

24        Summary judgment is proper "if the movant shows that there is no genuine dispute as to

25   any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

26   The moving party bears the initial burden of demonstrating the absence of a genuine issue of

27

28   [4] Richard Hughes and Jana Dolnikova were plaintiffs in this case.  Their complaints were
     dismissed with prejudice.  Dkt Nos. 18, 20.

United States District Court
Northern District of California

1  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however,

2  has no burden to disprove matters on which the non-moving party will have the burden of proof at

3  trial. The moving party need only demonstrate to the court "that there is an absence of evidence to

4  support the nonmoving party's case." *Id*. at 325.

5  Once the moving party has met its burden, the burden shifts to the non-moving party to

6  "designate specific facts showing a genuine issue for trial." *Id*. at 324 (quotation marks omitted).

7  To carry this burden, the non-moving party must "do more than simply show that there is some

8  metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

9  475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient;

10  there must be evidence on which the jury could reasonably find for the [non-moving party]."

11  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must "go

12  beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories,

13  and admissions on file, designate specific facts showing that there is a genuine issue for trial."

14  *Celotex*, 477 U.S. at 324 (internal quotations omitted).  "Disputes over irrelevant or unnecessary

15  facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec.*

16  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

17  In deciding a summary judgment motion, the court must view the evidence in the light

18  most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Anderson*

19  *v. Liberty Lobby, Inc.*, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence,

20  and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . .

21  ruling on a motion for summary judgment." *Id*.  However, conclusory or speculative testimony in

22  affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill*

23  *Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "uncorroborated and self-

24  serving" testimony that "flatly contradicts [ ] prior sworn statements" cannot create a genuine

25  issue of fact. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

### DISCUSSION

### I.  FIRST, SECOND, AND SIXTH CAUSES OF ACTION FOR RETALIATION

28  Romero asserts that he was retaliated against in violation of FEHA, California Health and

United States District Court
Northern District of California

17

Safety Code section 1278.5, and California Labor Code section 1102.5(b).  Romero asserts that the five peer review investigations against him between October 2010 and September 2011 were initiated to build evidence for his termination in retaliation for his complaints to hospital administrators, the EOD, and the EEOC. [5]

To establish a prima facie case of retaliation, a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (FEHA); *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129, 1144 (E.D. Cal. 2009) (section 1278.5 and section 1102.5).  "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action.  Once the employer carries this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. Only then does the case proceed beyond the summary judgment stage."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

FEHA defines protected activity as opposing practices forbidden under the statute such as discrimination, harassment, or retaliation on the basis of enumerated categories (i.e. race, religion, sex), or assisting in proceedings raising such claims.  CAL. GOV. CODE § 12940(h).

Section 1278.5 of the California Health & Safety Code encourages "health care workers to notify government entities of suspected unsafe patient care and conditions" and "declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility . . . ."  CAL. HEALTH & SAFETY CODE § 1278.5.

Section 1102.5(b) of the California Labor Code provides in pertinent part:

> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

CAL LAB. CODE § 1102.5.

Defendants do not dispute that Romero's EOD and EEOC complaints are protected

---

[5] The five cases are: K.H. (October 2010); P.O. and A. (February 2011); B.D. and R.S (September 2011).

United States District Court
Northern District of California

1    activities under these statutes.  Br. 15.  Making an informal complaint to a supervisor is also a

2    protected activity.  *Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000) (citation omitted).

3    Therefore Romero's August 2010 email to SCVMC administration and his subsequent EOD and

4    EEOC complaints are protected activities.

5            The heart of this dispute is whether Romero suffered cognizable adverse employment

6    actions.  The defendants contend that Romero cannot show an adverse employment action other

7    than his December 3, 2012 termination because a peer review is not an adverse employment action

8    that "affect[s] the terms, privileges, conditions, or duration of employment."  Br. 15-16 (citing

9    *Helgeson v. American International Group, Inc.*, 44 F.Supp.2d 1091, 1098-99 (S.D. Cal. 1999)

10   (plaintiff who was not fired, demoted, docked pay or benefits, or transferred to a less desirable

11   position failed to establish adverse employment action sufficient to support FEHA retaliation

12   claim).  Romero contends that a peer review is akin to an "undeserved negative performance

13   review" which the Ninth Circuit has determined may constitute an adverse employment action.

14   Opp. 15-16 (citing *Lawson v. Reynolds Indus.*, 264 Fed. Appx. 546, 548 (9th Cir. 2008)).

15           The Ninth Circuit "takes an expansive view of the type of actions that can be considered

16   adverse employment actions."  *Ray*, 217 F.3d at 1241.  "[A]n action is cognizable as an adverse

17   employment action if it is reasonably likely to deter employees from engaging in protected

18   activity."  *Id.* at 1243 (stating that "The EEOC has interpreted 'adverse employment action' to

19   mean 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter

20   the charging party or others from engaging in protected activity'" and "does not limit what type of

21   discrimination is covered, nor does it prescribe a minimum level of severity for actionable

22   discrimination.").  While "mere ostracism" by co-workers does not constitute an adverse

23   employment action, *see Strother v. Southern California Permanente Medical Group*, 79 F.3d 859,

24   869 (9th Cir. 1996), "undeserved performance ratings, if proven, would constitute 'adverse

25   employment decisions.'"  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

26           In *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997), the dissemination of an

27   unfavorable job reference was an adverse employment action "because it was a 'personnel action'

28   motivated by retaliatory animus."  Even though the defendant proved that the poor job reference

United States District Court
Northern District of California

did not affect the prospective employer's decision not to hire the plaintiff, "[t]hat this unlawful personnel action turned out to be inconsequential goes to the issue of damages, not liability." *Id*. The Ninth Circuit has rejected the rule that "only 'ultimate employment actions' such as hiring, firing, promoting and demoting constitute actionable adverse employment actions." *Ray*, 217 F.3d at 1242.

Romero has offered evidence to show that referral to peer review may constitute an adverse employment action. According to the SCVMC peer review policy, peer review results are used in the verification of clinical competence. ACB Decl., Ex. 2 at Ex. 187 (peer review committee policy and procedures). A practitioner receiving two peer review case ratings of Q3 or higher in a six-month period could be subject to disciplinary action, and negative peer review ratings may be grounds to deny physician privilege renewal and recredentialing. *Id*. An undeserved finding of fault in a peer review is not trivial - it can mar the performance record of an employee, change employment conditions, and increase an employee's vulnerability to termination. In that way it is akin to an unfavorable performance review that can affect the terms and conditions of employment. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1054-55 (2005) ("Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [FEHA].").

The defendants argue that Romero's peer reviews are not adverse employment actions because he received "a single unfavorable finding from the peer-review committee" and "was not disciplined, docked pay, transferred, or otherwise penalized as a result of the peer-review findings." Br. 16. That Romero did not receive enough negative peer review ratings to deserve disciplinary action does not exclude the possibility that the peer reviews themselves constitute adverse actions. *Hashimoto*, 118 F.3d at 675 ("We reject the government's 'no harm, no foul' approach . . . Title VII does not limit its reach only to acts of retaliation that take the form of

20

United States District Court
Northern District of California

1    cognizable employment actions such as discharge, transfer, or demotion.").

2         The next inquiry is whether Romero's peer review referrals were "causally linked" to his

3    complaints.  All the peer reviews about which Romero complains came close on the heels of his

4    August 2010 complaints.  Romero received notice that the K.H. peer review investigation was

5    initiated against him in October 2010, two months after his complaint and during the pendency of

6    the EOD investigation.  Two more of Romero's cases, P.O. and A., were investigated in February

7    2011.  The final two peer review investigations, B.D. and R.S., were initiated in September 2011.

8    The proximity in time between each of these adverse actions and Romero's August 2010

9    complaints is within the time frame sufficient for a jury to infer discriminatory motive.  *See Allen*

10   *v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002) (holding that an 11-month gap in time between the

11   protected speech and adverse action "is within the range that has been found to support an

12   inference than an employment decision was retaliatory").  Romero also filed complaints in August

13   2011, only one month before the September 2011 peer review investigations.  ACB Decl. Ex. 3 at

14   Ex 120 (email titled "Sham peer review - Whistleblower Retaliation" to SCVMC administrators);

15   Paschal Decl. ¶¶ 3-6 (second EOD complaint and investigation).

16        Romero has also presented evidence from which a jury could conclude that SCVMC's

17   peer review investigations were pretextual.  In the two years preceding Romero's August 2010

18   complaints, he did not receive a single peer review referral.  This is in stark contrast to the five

19   peer review referrals that Romero received after his complaints.  The defendants assert that the

20   increase in the number of referrals was due in part to the change in SCVMC's peer review policy.

21   Neither party has provided evidence to determine whether the number of Romero's cases referred

22   to peer review was inordinate when compared to the number of his colleagues' cases referred for

23   review.  However, Romero offers evidence that he was among three doctors who were unfairly

24   "targeted" in peer reviews.[6]  Schnier Dep. at 21:17-24:24.  Romero also offers evidence to suggest

25

26   _____

27   [6] Romero also provided evidence that he was treated differently in compliance investigations.
     While Romero was reported to compliance director Anna Hughes for allegedly revealing
     confidential peer-review information about Dr. Shnier, defendants Yeh and Philip were not
28   reported for disclosing confidential information related to Dr. Dolnikova's peer reviews.  ACB
     Decl. Ex 3 at 74:6-75:10, Ex. 116.

                                                    21

1    that his peer review investigations were conducted improperly.  Romero's contemporaneous

2    emails and complaints to SCVMC staff challenged the procedures implemented to review the K.H.

3    case and its outcome.  *See* ACB Decl. Ex. 3 at Ex. 120; Ex. 6 at Ex. 280.  Romero also alleges that

4    Moritz and Yeh kept patient charts and other files from him.  *Id.*   Additionally, the case of patient

5    B.D. was referred to peer review one year after the patient's death, which is considered "late"

6    under SCVMC policies, but only one month after Romero's August 2011 complaint.  ACB Decl.

7    Ex. 6 at 179:18-180:1; Romero Dep. at 252:3-16.  A jury could find from these facts that

8    SCVMC's assertion that the increased number of Romero's peer review referrals in 2010 to 2011

9    was merely due to the change in policy is false and pretextual.[7]

10          The defendants point to *Boparai v. Shinseki*, which states that "[t]he weight of case law

11    suggests that referral to peer review does not constitute an adverse employment action."  No. 09-

12    CV-1164 AWI JLT, 2011 WL 4738527, at *10 (E.D. Cal. Oct. 5, 2011).  *Boparai* and the out-of-

13    circuit cases it relies on are distinguishable because in those cases there was no causal link

14    between the complaint and the peer review.  The *Boparai* court noted that "a finding of fault in a

15    peer review is much more like an unfavorable performance review than a simple negative

16    utterance from a coworker . . . ," but ultimately determined that the defendant's initiation of a peer

17    review against the plaintiff was not an adverse employment action because there was no causal

18    link due to a one-year gap between the plaintiff's EEOC complaint and the peer review.  *Id.* at

19    *11, 13.  In *Patt v. Family Health Systems, Inc.*, the Seventh Circuit found that peer reviews did

20    not constitute adverse employment actions because there was "no basis to conclude that the

21    number of [plaintiff's] cases referred to peer review was inordinate . . . Nor has [plaintiff] offered

22    evidence to suggest that any of her cases were inappropriate for peer review."  280 F.3d 749, 754

23    (7th Cir. 2002).  In *Hussain v. Prinicipi*, the court determined that a referral to peer review could

24    not be the basis for a retaliation claim because the plaintiff's name was eventually cleared.  344 F.

25    Supp.2d 86, 105 (D. D.C. 2004).  In *Renta v. County of Cook*, the plaintiff did not even contend

27    [7] Defendants assert that the K.H. case met the criteria for an automatic peer-review referral
     because a nurse reported the case to the Patient Safety Network, so therefore the investigation was
28    not initiated due to retaliation.  However, Romero has shown evidence raising an inference that the
     peer review was handled improperly.

United States District Court
Northern District of California

that her referral to peer review was an adverse employment action. 735 F. Supp. 2d 957, 974 (N.D. Ill. 2010) ("Defendants contend that Tomar's May 22, 2003 referral to peer review was not an adverse employment action, and Renta does not contend as much.").

Here, Romero was subjected to five investigations that threatened to change the terms of his employment within one year from his first complaint.  The last two of these investigations were initiated within weeks of his whistleblower complaint to SCVMC administration and his second complaint to the EOD.  Although these referrals could have occurred for a number of reasons, Romero has presented evidence supporting an inference that they were initiated in retaliation for his protected activity.  Unlike the cases relied on in *Boparai*, Romero has also offered evidence that he was treated differently than his colleagues, unfairly "targeted," and that the peer review procedures were improper.

Romero also contends that his December 3, 2012 termination from SCVMC was in retaliation for his complaints.  Unlike the peer review investigations, Romero has not offered evidence of a causal link between his complaints and his termination.  His termination was sixteen months after his August 2011 whistleblower complaint and second EOD complaint.  While Romero made other complaints after August 2011 and while he was on medical leave, he has not offered evidence that the defendants were aware of those complaints.  Romero also fails to rebut the defendants' proffered legitimate reason for his termination.  The defendants contend that Romero was terminated because he exhausted the County's leave policy and failed to identify any reasonable accommodations.  As detailed in section III below, Romero has not shown that these reasons are pretextual.

Romero has made his prima facie case, and there are material facts in dispute.  The motion for summary judgment on the first, second, and sixth claims for retaliation is DENIED to the extent Romero's retaliation claims are based on the 2010 and 2011 peer review investigations.

## II.  THIRD CAUSE OF ACTION FOR RETALIATION IN VIOLATION OF FIRST AMENDMENT

In order to state a First Amendment claim against a public employer, an employee must show: "1) the employee engaged in constitutionally protected speech; 2) the employer took

1    'adverse employment action' against the employee; and 3) the employee's speech was a

2    'substantial or motivating' factor for the adverse action." *Marable v. Nitchman*, 511 F.3d 924,

3    929 (9th Cir. 2007).  In order to be protected, the speech in question must address "a matter of

4    public concern." *Freitag v. Ayers*, 463 F.3d 838, 853 (9th Cir. 2006).

5            The defendants argue that Romero's speech is not subject to constitutional protection

6    because it does not involve a matter of public concern, but rather "individual personnel disputes

7    and grievances."  Opp. 20-21.  In the Ninth Circuit, "[i]t is only when it is clear that . . . the

8    information would be of no relevance to the public's evaluation of the performance of

9    governmental agencies that speech of government employees receives no protection under the

10   First Amendment." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 978-79 (9th Cir. 2002)

11   (citations and quotation marks omitted); *accord Connick v. Myers*, 461 U.S. 138, 146 (1983)

12   (holding that First Amendment affords no protection "[w]hen employee expression cannot be

13   fairly considered as relating to any matter of political, social, or other concern to the community").

14   Speech that "relates to internal power struggles within the workplace," generally does not involve

15   matters of public concern. *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir.1996); *see

16   also Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992) ("Speech focused solely on internal

17   policy and personnel grievances does not implicate the First Amendment.").

18           To lend support to a finding of public concern, the content of complaints about

19   management must reach beyond personal grievances to issues of "broader societal concern."

20   *Desrochers v. City of San Bernardino*, 572 F.3d 703, 713 (9th Cir. 2009).  The "critical inquiry is

21   whether the employee spoke in order to bring wrongdoing to light or merely to further some

22   purely private interest." *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991).  For

23   example, the Ninth Circuit found it significant that public complaints about the management of a

24   library highlighted how the alleged mismanagement was negatively affecting library service.  *See

25   Lambert v. Richard*, 59 F.3d 134, 136 (9th Cir. 1995).  There, the plaintiff, Lambert, read a

26   prepared statement criticizing her supervisor, the director of the local library, at a city council

27   meeting.  *Id*. at 135. The supervisor was described as an individual who "mismanaged the library

28   department and treated employees in an abusive and intimidating manner."  *Id*. at 136.  His

United States District Court
Northern District of California

24

1    conduct was allegedly "having an adverse effect on service to the public." *Id*. "Lambert told the

2    council that the library was 'barely' functioning and that employees who dealt regularly with the

3    public were performing 'devoid of zest, with leaden hearts and wooden hands.'" *Id*. The court

4    concluded that Lambert's speech was on a matter of public concern. *Id*. ("Given that operation of

5    a public library is among the most visible of the functions performed by city governments, [the

6    employee] had a Constitutional right - and perhaps a civic duty - to inform the council if library

7    service was jeopardized by poor management at the top.").

8           Although Romero's August 2011 complaint details personal frustrations with King, the

9    crux of his complaint is that King's conduct negatively impacted the hospital, other employees,

10   and patient safety.  Public employee speech is protected when it highlights inappropriate standards

11   affecting patient care at a public hospital.  *See Ulrich*, 308 F.3d at 978-79 (9th Cir. 2002)

12   (physician's statements criticizing layoffs of other physicians constituted speech on matter of

13   public concern); *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1406 (9th Cir. 1988) (holding that

14   hospital's retaliation against employee for his criticisms of hospital's wastefulness,

15   mismanagement, violations of regulations, and incompetence was violation of employee's First

16   Amendment rights).  Romero's August 31, 2010 complaint alleges that King  "deliberately

17   withheld information from both the CRNA and the surgical team to best inform their decisions"

18   and "decided to deviate from the standard practice of care" in his treatment of the obstetric patient.

19   The complaint states, "this is the SECOND time this year where it has involved patient

20   endangerment."  The complaint concludes that King's "sense of impugnity and infallibility has

21   now escalated beyond the simple scope of bullying, harassment, and homophobia to a very visible

22   and transparent level of patient endangerment."  These aspects of Romero's speech indicate that

23   he spoke "in order to bring wrongdoing to light," not "merely to further some purely private

24   interest."  *Ulrich*, 308 F.3d at 979 (citation omitted).  Romero made further complaints in 2010

25   and 2011 to public agencies, the EOD and EEOC, as well as SCVMC administrators, detailing his

26   concerns regarding the Anesthesia Department's mismanagement.   These activities weigh in favor

27

28

United States District Court
Northern District of California

25

1    of a finding of public concern.[8]

2        As detailed above, Romero has set forth sufficient facts from which a jury could conclude

3    that his complaints were motivating factors for the adverse treatment he received.  Since there are

4    material facts in dispute, summary judgment on this claim is DENIED.

5    ## III.  ELEVENTH, TWELFTH, AND THIRTEENTH CAUSES OF ACTION FOR DISABILITY DISCRIMINATION

6        The ADA prohibits employers from discriminating against any "qualified individual on the

7    basis of disability." 42 U.S.C. § 12112. Similarly, under FEHA, it is unlawful for an employer to

8    discriminate on the basis of "physical disability." CAL. GOV. CODE § 12940(a).  In evaluating

9    discrimination claims under both the ADA and FEHA, courts apply the McDonnell Douglas three-

10   part burden-shifting framework.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 (2003) (*citing*

11   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d

12   1089, 1113 (Cal. 2000).  Under this framework, the plaintiff must first establish a prima facie case

13   of disability discrimination; the burden then shifts to the employer to demonstrate a "legitimate,

14   nondiscriminatory reason" for the challenged action; the burden then shifts back to the plaintiff to

15   prove that the employer's asserted reason is pretextual.  *Snead v. Metro. Prop. & Cas. Ins. Co.*,

16   237 F.3d 1080, 1093 (9th Cir. 2001).

17       To establish a prima facie case of disability discrimination under the ADA and FEHA, a

18   plaintiff must show that "(1) she is disabled within the meaning of the ADA; (2) she is a qualified

19   individual able to perform the essential functions of the job with or without reasonable

20   accommodation; and (3) she suffered an adverse employment action because of her disability."

21   *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir.2012) (alterations

22   omitted); *Avila v. Cont'l Airlines*, 165 Cal. App. 4th 1237, 1246 (2008).[9]

23       The parties disagree whether Romero was "qualified" to perform the essential functions of

---

[8] For these reasons, Romero's complaints also fall within the protection of California Health & Safety Code section 1278.5, which "declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility . . . ."

[9] Because the FEHA provisions relating to disability discrimination are based on the ADA, the state and federal disability claims may be analyzed together in the absence of contrary or different law on a particular issue.  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 n.6 (9th Cir. 2001).

United States District Court
Northern District of California

his job.  Under the ADA and FEHA, a qualified individual is one with a disability who, with or without reasonable accommodation, can perform the essential functions of the job the individual holds.  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012); *Jackson v. Simon Prop. Grp., Inc.*, 795 F.Supp.2d 949, 959 (N.D. Cal.2011); see also 42 U.S.C. § 12111(8); CAL. GOV. CODE 12940(a)(1).  Romero bears the burden of demonstrating that he can perform the essential functions of the job with or without reasonable accommodation.  *Kennedy v. Applause, Inc.*, 90 F.3d 1477 1481 (9th Cir. 1996).

The undisputed evidence demonstrates that Romero could not perform the functions of an anesthesiologist at SCVMC.  Romero's doctors repeatedly advised that he could not return to SCVMC.  They stated that he suffered from "clinically significant distress and impairment in both social and occupational functioning."  Romero Dep. at Exs. 41, 42.  Romero contends that he was able to perform the functions of his job because he was performing the job duties of an anesthesiologist at Stanford University Hospital while on leave from SCVMC.  Opp. 26-27. While Romero's doctors cleared him to work at Stanford, they specifically advised that Romero could *not* return to SCVMC. MK Dec. Ex. S, Verrinder Dep., at 108:8-109:9, Ex. N.  In fact, Romero's therapists warned that Romero might have a psychiatric relapse if he returned to SCVMC.  MK Dec. Ex. S at 119:4-130:5, Ex. P.  *See also* ACB Decl. Ex. 13 at 60:15-61:10

Romero contends that he "needed an accommodation so he could perform those same duties at SCVMC without fear of additional retaliatory treatment."  Opp. at 27.  Romero contends that "[a]ll Dr. Romero needed to return to work was 'to feel safe.'" ACB Decl. Ex 13 at 42:11-43:5.  But the undisputed evidence shows that Romero did not identify any reasonable accommodations that would have allowed him to return to work as an anesthesiologist at SCVMC.

In order to prevail on a claim of failure to accommodate, the plaintiff bears the initial burden to show the existence of a reasonable accommodation.  *Zukle v. Regents of University of California*, 166 F.3d 1041, 1046 (9th Cir. 1999).  SCVMC asked Romero whether he needed an accommodation and sent its reasonable accommodations policy and paperwork to him on multiple occasions while he was on leave.  *See e.g.*, Romero Dep. at Exs. 32, 38.  Romero and his doctors responded on several occasions that they did not request accommodations.  *See Id.* at Ex. 33

27

United States District Court
Northern District of California

("December 2, 2011 from Romero stating that his "health care provider did not request reasonable accommodations"), Ex. 40 (January 27, 2012 letter from Romero stating, "[a]t this date, neither my treating physician nor I have requested reasonable accommodation pertaining to my return."); MK Decl. Ex. S at Ex. H (January 26, 2012 letter from Verrinder stating, "[a]t this time, the above named patient is still on disability and is not released from clinical care.  I have not requested a reasonable accommodation for him based on the Santa Clara County Hospital Policies and Procedures and the Americans with Disabilities Act.").  Romero cannot now point the blame at SCVMC for denying him reasonable accommodations when he failed to identify any.

Romero contends that SCVMC's refusal to extend his leave beyond December 3, 2012 was a failure to accommodate.  This argument fails because neither Romero nor his doctors requested an extension of his medical leave beyond December 3, 2012.  SCVMC provided Romero reasonable accommodations by extending his leave multiple times from November 18, 2011 through December 2, 2012.  Romero contends that the November 21, 2013 note from Dr. Verrinder requested another extension until January 2013.  The letter states:

> In my professional opinion, Dr. Romero should not attend the meeting at Santa Clara Valley Hospital scheduled for Monday, December 3, 2012.  It should be rescheduled for late January 2013.  Due to a history of ongoing retaliation by the hospital administration, combined with recent life stressors from family health issues, this meeting might result in further psychiatric relapse.  I understand that Dr. Romero is experiencing some life stresses related to family medical issues, which will require his attention during the winter holidays.  This meeting should be rescheduled later in January 2013.

MK Decl. Ex. S at Ex. P.

The letter does not request another extension of Romero's medical leave, state that he was still under the care of his doctors, or say that he could not return to work.  It merely requests that a meeting be rescheduled.  The language of the letter varies significantly from Romero's doctors' previous correspondence, which clearly request and extend his medical leave.  *See Id*. Ex. F (letter from Verrinder stating, "in my professional opinion he needs to be placed on short-term medical disability for two months"), Ex. H (letter from Verrinder stating, "At this time, the above named patient is still on disability and is not released from clinical care"); Romero Dep. Ex. 44 (letter from Verrinder stating, "in my professional opinion, he needs to continue on medical disability

1    until October 1, 2012" and letter from Collyer stating "I am currently treating Luke Romero, and I

2    am extending his medical leave until October 1, 2012."), Ex. 46 (letter from Spivak stating "Mr.

3    Romero [sic] disability has been extended to November 30th, 2012."). Furthermore, Dr. Verrinder

4    testified that she did not request accommodations in the November 21, 2012 letter.  MK Decl. Ex.

5    S at 125:15-127:17.  This evidence is fatal to Romero's claim.

6         Romero has also failed to show that SCVMC's claim that his absence created a hardship

7    was pretext.  Romero contends that SCVMC anticipated Romero to take a one to two-year

8    pediatric fellowship at Stanford Hospital in July 2012.  Opp. 1-2, 12-13.  There is no evidence that

9    Romero's request was firmly approved.  Moritz's January 2011 email only states that he supports

10   Romero's request and that he anticipated Romero could take leave in July 2012.  Mortiz's letter of

11   recommendation is undated and does not specify which dates the fellowship would span.  ACB

12   Decl. Ex 1 at 58:4-18; Ex 58.

13        Romero's claim that SCVMC failed to engage in the interactive process also fails.  "The

14   interactive process requires communication and good-faith exploration of possible

15   accommodations between employers and individual employees, and neither side can delay or

16   obstruct the process."  *Humphrey v. Mem'l Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).

17   "[I]t is the employee's initial request for an accommodation which triggers the employer's

18   obligation to participate in the interactive process of determining one.  If the employee fails to

19   request an accommodation, the employer cannot be held liable for failing to provide one." *Spitzer*

20   *v. The Good Guys, Inc.*, 80 Cal.App.4th 1376, 1384 (Cal. Ct. App. 2000).  As detailed above,

21   Romero clearly and repeatedly stated that he did not request any reasonable accommodations.

22   Romero also failed to complete and return any paperwork in the SCVMC reasonable

23   accommodations packet, including Form A, which the policy requires to begin the interactive

24   process and request any accommodations.[10]  The evidence demonstrates that it was Romero, not

25

26   [10] Romero's counsel wrongly asserted at the hearing that SCVMC failed to engage in the
     interactive process by not responding to Romero's October 29, 2012 request for "a list of the
27   neutral unbiased physicians outside the SCVMC in San Francisco . . . ."  ACB Dec., Ex 3 at Ex.
     135.  Romero was not seeking to engage in the interactive process at that time.  He simply wanted
28   to insure that he was not retaliated against when he submitted to a physical and mental exam so

SCVMC, who refused to engage in the interactive process.  Consequently, this claim fails.[11]

## IV.  FOURTH, FIFTH, AND SEVENTH CAUSES OF ACTION FOR ALLEGED TORT VIOLATIONS

### A.  Invasion of Privacy

Romero contends that the County and Moritz "spread false and highly offensive information about Dr. Romero in his erroneous performance review and in the May 9, 2011 email in which he called into question Dr. Romero's ability to practice medicine . . . ."  Opp. at 22.[12]  A plaintiff alleging an invasion of privacy "must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy."  *Hill v. National Collegiate Athletic Assn.*, 7 Cal.4th 1, 39-40, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994); *Leonel v. American Airlines, Inc.*, 400 F.3d 702, 712 (9th Cir. 2005).  "If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law."  *Hill*, 7 Cal.4th at 40, 26 Cal. Rptr. 2d 834, 865 P.2d 633.

---

that he could return to work.  Indeed, his letter states "I will be able to provide a comprehensive physical and mental exam by my health care providers to attest that *I am capable of fulfilling my clinical duties without reasonable accommodations*." (Emphasis added.)

[11] Romero's counsel argued at the hearing that defendants' reliance on their counsel when they refused to extend Romero's leave beyond December 3, 2012, was evidence of a breach of the interactive process.  But since Romero did not initiate a request for an accommodation, this argument is immaterial.  Romero's counsel also asserted that County counsel's involvement was "suspicious" and suggests that the termination was not "legitimate."  There is no evidence in the record that Romero's termination decision was handled differently than other SCVMC employees.

[12] Romero testified at his deposition that his claim for invasion of privacy is based on a belief that Moritz hacked into his work computer to read his emails.  Romero Dep. at 559:1-560:18.  Romero does not raise this argument in his opposition.  An employee generally has no reasonable expectation of privacy in the use of an employer's computers.  *See, e.g., Holmes v. Petrovich Development Co., LLC*, 191 Cal.App.4th 1047, 1069 (2011) (employee had no reasonable expectation of privacy in her personal e-mail messages sent to her attorney using her employer's computer and could not prevail on an invasion of privacy claim); *TBG Ins. Services Corp. v. Superior Court*, 96 Cal.App.4th 443, 452 (2002) ("use of computers in the employment context carries with it social norms that effectively diminish the employee's reasonable expectation of privacy with regard to his use of his employer's computers.").

United States District Court
Northern District of California

United States District Court
Northern District of California

Romero has not identified a legally protected privacy interest in the information on his work performance evaluation, or in the information that Moritz communicated to Goel via email on May 9, 2011.  Nor is there any evidence to suggest that there was a reasonable expectation of privacy in the circumstances.  SCVMC administration had an obligation to review Romero's performance as an anesthesiologist.  It is not unusual for management to discuss concerns about employee performance, and there is no evidence that Romero's work performance evaluation was shown to anyone outside of SCVMC administration.  Two members of management discussing an employee's capabilities is not "an egregious breach of the social norms underlying the privacy right."  *Hill*, 7 Cal.4th at 37.  Consequently, this claim fails.

## B.  Slander Per Se

Romero asserts that Moritz slandered him when he (i) erroneously noted a Q5 rating on Romero's 2011 performance evaluation; and (ii) reported concerns regarding Romero's clinical skills to Goel via email on May 9, 2011.[13]  TAC ¶ 92; Opp. 23. Defendants contend that Moritz's statements are protected under the common interest privilege. Br. 21-23.  Romero counters that the qualified privilege is inapplicable because Moritz made the statements with malice.  Opp. 23.

To state a prima facie case of slander, a plaintiff must show an intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage.  *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999).  A statement that falls within one of the first four categories of California Civil Code section 46 constitutes slander per se and does not require proof of actual damages.  *Regalia v. Nethercutt Collection*, 172 Cal. App. 4th

---

[13] Romero testified in his deposition that his slander claim is based on Moritz's presentation of patient K.H.'s case at the May 9, 2011 staff meeting, which he his coworkers described to him as "character assassination" and "slanderous." Romero Dep. at 562:6-20.  Romero does not raise this argument in his opposition, and it fails in any event.  He has not presented any evidence of what was said at the May 9, 2011 meeting beyond his own inadequate deposition testimony.  Summary judgment is proper on a defamation claim where the plaintiff cannot provide any admissible evidence demonstrating the allegedly slanderous statements made.  *See, e.g., Courtney v. Canyon Television & Appliance Rental Inc.,* 899 F.2d 845, 851 (9th Cir. 1990); *Flores v. Von Kleist,* 739 F. Supp. 2d 1236, 1258-59 (E.D. Cal. 2010); *Walker v. Boeing Corp.,* 218 F.Supp.2d 1177, 1191-93 (C.D. Cal. 2002).

361, 367 (2009).  Section 46(3) includes statements that:

> Tend[ ] directly to injure him in respect to his office, profession[, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits[.]

CAL. CIV.CODE § 46(3).

Civil Code section 43.81 confers a privilege on "any person" who makes a communication "to any hospital [or] hospital medical staff . . . when the communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts." *Hassan v. Mercy Am. River Hosp.*, 31 Cal. 4th 709, 713 (2003).  The privilege is qualified.  *Id.* at 724.  With qualified privileges, the plaintiff bears the burden of proving that defendant made the statement with malice.  *Id.* at 718.

"Malice may be established by showing that the defendant lacked reasonable grounds to believe the statement true and therefore acted with reckless disregard for plaintiff's rights." *Duste v. Chevron Products Co.*, 738 F. Supp. 2d 1027, 1043 (N.D. Cal. 2010) (citations omitted). "Negligence on the part of the speaker is not tantamount to malice." *Id.* (citation omitted).  "Thus, in demonstrating reckless disregard, it is not sufficient that the statements are shown to be inaccurate, or even unreasonable." *Id.*  "Only willful falsity or recklessness will suffice." *Id.*

Romero has not established a prima facie case of slander.  Moritz's May 9, 2011 email to Goel states, "I am concerned about the care provided by Dr. Luke Romero.  We have two cases, one of which was considered completely below standard of care . . . [that] was so mishandled as to question his ability to provide good medical judgment in the care of our patients.  ACB Decl. Ex 1 at Ex. 85.  Mortiz's statement that the K.H. case "was considered completely below the standard of care" is not false, as evidenced by the fact that the case received a "Q4" rating by the peer review committee and an outside anesthesiologist found it below the standard of care.  Therefore the statement is not actionable.  Mortiz's statement that the case "was so mishandled as to question his ability to provide good medical judgment in the care of our patients," while critical of Romero's abilities as a physician, is a statement of opinion, and therefore not actionable. *McGarry v. University of San Diego*, 154 Cal. App. 4th 97, 112 (2007).  *See also Rangel v. Am.*

United States District Court
Northern District of California

1    *Med. Response W.*, No. 09-CV-01467-AWI, 2013 WL 1785911, at *7 (E.D. Cal. Apr. 25, 2013)

2    (statements that employee "was worthless, not a good employee and did not deserve to be working

3    as an EMT" constitute non-actionable opinion).

4            The undisputed evidence shows that Romero did not receive a peer review Q5 rating, and

5    so this statement is false.  However, Romero has not pointed to evidence supporting an inference

6    that Moritz knew the statement was wrong, much less that the statement was made with malice.[14]

7    *Compare Duste*, 738 F. Supp. At 1042 (finding malice where "[Defendant] has admitted that his

8    allegations that Plaintiff frequented gentlemen's clubs and brothels were wrong").  Consequently,

9    this statement is subject to the privilege of Civil Code 43.81.  Romero's slander per se claim fails

10   as a matter of law.

11           **C.  Intentional Infliction of Emotional Distress**

12           To establish intentional infliction of emotional distress, Romero must show outrageous

13   conduct by the defendants.  *Heller v. Pillsbury Madison & Sutro*, 50 Cal.App.4th 1367, 1388

14   (1996).  To be outrageous, the conduct must be so extreme as to "exceed all bounds of that usually

15   tolerated in a civilized society."  *King v. AC & R Adver.*, 65 F.3d 764, 770 (9th Cir.1995) (internal

16   quotation marks omitted and citation).  "Summary judgment is proper if a claim cannot reasonably

17   be regarded as so extreme and outrageous as to permit recovery."  *Id*. (internal quotation marks

18   and citations omitted).

19           Romero's emotional distress claim is based on his contention that Mortiz made "false and

20   slanderous statements, designed [to] poison the hospital management against Dr. Romero,

21   constituted extreme and outrageous conduct. Falsely stating that Dr. Romero was not fit to care for

22   patients and falsely reporting that Dr. Romero received a Q5 is an abuse of Dr. Moritz's power

23   designed to cause Dr. Romero extreme emotional distress."  Opp. 24.  Because these statements

24   are not false or slanderous, as discussed above, Romero has failed to show extreme and outrageous

25   _____

26   [14] Romero contends that Moritz knew the statement was wrong because "Dr. Moritz stated he
     reviewed documents" before completing the evaluation form.  Opp. 20.  This argument misstates
27   the evidence.  Romero's counsel asked Mortiz in his deposition whether he "looked at something"
     before completing the evaluation form, but does not establish what he looked at, whether the
28   "something" was a document, or whether it was information regarding Romero's peer review
     scores. *See* ACB Decl. Ex. 1 at 88:24-89:7.

United States District Court
Northern District of California

1  conduct and his emotional distress claim also fails.[15]

2  **V.  EIGHTH CAUSE OF ACTION FOR DISCRIMINATION**

3      Romero's third amended complaint alleges discrimination under Title VII and FEHA on

4  the basis of sexual orientation, age, and gender against the County.  Defendants argue that

5  Romero's claim that he was discriminated against based on his sexual orientation is time-barred

6  because he failed to exhaust his administrative remedies.  Romero fails to address this cause of

7  action in his opposition to the motion for summary judgment.  *See* Opp.

8      The defendants are correct that Romero's FEHA claim for sexual orientation

9  discrimination is time-barred.  "Under both Title VII and FEHA, exhaustion of administrative

10  remedies is a prerequisite to resort to the courts. Under Title VII, a plaintiff must file a complaint

11  before the Equal Employment Opportunity Commission [] and under FEHA, a plaintiff must file a

12  complaint before the Department of Fair Employment and Housing []."  *Leland v. City & Cnty. of*

13  *San Francisco*, 576 F. Supp. 2d 1079, 1090 (N.D. Cal. 2008).  Romero has not presented any

14  evidence that he filed a claim with the DFEH.

15      Romero has not presented any other evidence to support his Title VII and FEHA

16  discrimination claims other than King's 2003 statement.  Romero admitted in his deposition that

17  the 2003 statement is his only evidence of sexual orientation discrimination.  Romero Dep. at

18  160:15-22.  Romero has not provided evidence that the adverse actions he suffered were on

19  account of his sexual orientation, age, or gender, let alone that King's 2003 comment was linked

20  to the adverse actions taken against him.  *See Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169,

21  1180 (9th Cir.1998) (to establish discrimination, plaintiff must show sufficient nexus between

22  alleged discriminatory remarks and adverse employment decision).  Therefore Romero's

23  discrimination claims fail.

24  **VI.  NINTH CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT**

25      To establish a prima facie case of hostile work environment under Title VII and the FEHA,

26  Romero must establish that he was subjected to verbal or physical conduct of a harassing nature

27

28  _____

[15] Because this claim fails I need not reach the defendants' argument that the County is immune
from liability under California Government Code section 815(a).  Br. 23-24.

United States District Court
Northern District of California

34

1   that was based on a protected category, and that the conduct was "sufficiently severe or pervasive

2   to alter the conditions of the plaintiff's employment and create an abusive working environment."

3   *Nagar v. Found. Health Sys., Inc.*, 57 F. App'x 304, 305 (9th Cir. 2003).

4           Romero's opposition does not address this claim.  To the extent the hostile work

5   environment claim stems from the same allegations underlying Romero's discrimination claim, he

6   has failed to allege sufficient facts suggesting that gender, age, or sexual orientation played any

7   part in the adverse employment actions against him.  This necessarily defeats any allegation that

8   the hostile work environment was on account of protected characteristics.  The claim fails.

9       **VII.       TENTH CAUSE OF ACTION FOR WRONGFUL TERMINATION**

10          Romero contends that he was wrongfully terminated in violation of Title VII, FEHA,

11  California Health and Safety Code section 1278.5, California Labor Code section 1102.5, and the

12  ADA.  As explained above, Romero has not met his burden of showing that his termination was in

13  retaliation for his complaints.  He has not offered evidence of a causal link, and he fails to provide

14  evidence that the defendants' legitimate reasons for his termination are pretextual.  Therefore

15  Romero's claims for wrongful termination under Title VII, FEHA, California Health and Safety

16  Code section 1278.5, and California Labor Code section 1102.5 fail.

17          Romero's claim of wrongful termination in violation of the ADA also fails because he has

18  not offered evidence that he was terminated due to "protected activity" under that statute.  *Pardi v.*

19  *Kaiser Found. Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004) ("Pursuing one's rights under the

20  ADA constitutes a protected activity.").  Romero's August 2010 and August 2011 complaints did

21  not allege disability discrimination.  Romero did allege disability discrimination in charges with

22  the EEOC on January 26, 2012 and September 24, 2012.  In those complaints, Romero alleged

23  that the County discriminated and retaliated against him by tampering with his reappointment

24  application and suspending his staff privileges.  Romero Dep. Ex. 22.  The complaints also

25  contend that Romero was falsely accused of HIPAA and peer-review confidentiality breaches.  *Id*.

26  Romero has not offered evidence that these alleged actions were on account of his disability.

27  Romero's privileges were suspended according to SCVMC bylaws, and the privacy breach

28  investigations against him were initiated by complaints made by Jovon Sadler and Dr. Schnier,

35

1   who Romero does not allege had any part in the alleged retaliation against him.   This claim fails.

2   **VIII.   ADMINISTRATIVE MOTIONS TO SEAL**

3       I previously denied the parties' administrative motions to seal because they failed to

4   comply substantively and procedurally with Civil Local Rule 79-5.  Dkt. No. 105.  The parties

5   filed amended motions to seal that fully comply with the local rule and that narrowly tailor their

6   requests to seal supported by "compelling reasons" to do so.  *See* Dkt. Nos. 107-112; *Kamakana v.*

7   *City & Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006).  The amended motions to seal are

8   GRANTED.

9                                **CONCLUSION**

10      For the reasons above, the defendants' Motion for Summary Judgment is GRANTED on

11  Romero's Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Causes

12  of Action for invasion of privacy, slander per se, intentional infliction of emotional distress,

13  discrimination under Title VII and FEHA, hostile work environment, wrongful termination, failure

14  to provide reasonable accommodation, failure to engage in the interactive process, and disability

15  discrimination under the ADA.

16      The motion for summary judgment is DENIED on the First, Second, Third, and Sixth

17  Causes of Action for retaliation in violation of FEHA, California Health and Safety Code section

18  1278.5, California Labor Code section 1102.81, and the First Amendment.

19      The parties' administrative motions to seal are GRANTED.

20      **IT IS SO ORDERED**.

21  Dated: July 10, 2014

22                                   _____

23                                   WILLIAM H. ORRICK
                                     United States District Judge
24

25

26

27

28

United States District Court
Northern District of California

36